ORIGINAL

FILED IN OPEN COURT
U.S.D.C. - Atlanta

JUN 13 2017

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>NORMA ERIZA-GOMEZ;<br>MARINA ERIZA-GOMEZ | **UNDER SEAL**<br><br>Criminal Indictment<br><br>No. **1:17CR204** |

THE GRAND JURY CHARGES THAT:

**Count One**
*Money Laundering Conspiracy*
(18 U.S.C. § 1956(h))

1. Beginning in or about 2013, and continuing to on or about the date of this Indictment, the exact dates unknown to the Grand Jury, in the Northern District of Georgia and elsewhere, the defendants, NORMA ERIZA-GOMEZ and MARINA ERIZA-GOMEZ, did knowingly combine, conspire, and agree with each other and with others, both known and unknown to the Grand Jury, to commit offenses against the United States in violation of Title 18, United States Code, Section 1956 to wit:

   a) to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, proceeds from the sale and distribution of a controlled substance, knowing that the transactions were designed in whole or in part to conceal and disguise the

nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i);

b) to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, proceeds from the sale and distribution of a controlled substance, knowing that the transaction was designed in whole and in part to avoid a transaction reporting requirement under Federal law, and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(ii); and

c) to transport, transmit and transfer and attempt to transport, transmit and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, that is, the sale and distribution of a controlled substance, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

## Background

2. During the time period of the conspiracy, the defendants often used a series of Georgia-based "money transmitter" agents. Money transmitters offered various services to their customers, including the ability to electronically transmit funds to other countries. In practice, individuals seeking to use one of these money transmitters brought currency to an agent location (oftentimes, a convenience store or grocery store). The agent collected the funds along with certain information from the customer, such as the recipient's name and contact information, and provided the customer with a verification code that the recipient could use to retrieve the funds from another agent location. The money transmitters therefore provided a means for customers to securely and rapidly transmit funds throughout the world.

3. The money transmitters were each registered with the U.S. Department of Treasury, Financial Crimes Enforcement Network ("FinCEN"), which permitted them to wire third party funds. During the above-listed time period, the Bank Secrecy Act (31 U.S.C. § 5300, *et. seq.*) and its implementing regulations imposed certain recordkeeping and reporting requirements upon money transmitters and their agents.

4. For example, the Bank Secrecy Act and its implementing regulations required these money transmitters to maintain records related to certain high dollar transfers; for each transmission of $3,000 or more, money transmitters were required to record the sender's name and address. 31 C.F.R. § 1010.410(e).

Individual money transmitters often kept more stringent record-keeping requirements in place for their agents. Additionally, money transmitters were required to file certain reports with FinCEN regarding financial transactions that involved suspicious or potentially illegal activity. 31 U.S.C. § 5318(g)(1); 31 C.F.R. § 1022.320(a)(2). These reports were commonly known as "Suspicious Activity Reports" (SARs). Pursuant to 31 C.F.R. § 1022.320(a)(2), the money transmitter was required to file a SAR if the financial transaction at issue involved at least $2,000 in funds and the business knew, suspected, or had reason to suspect that the transaction (or a pattern of transactions of which the transaction was a part):

    a. involved funds derived from illegal activity or was intended or conducted in order to hide or disguise funds or assets derived from illegal activity (including, without limitation, the ownership, nature, source, location, or control of such funds or assets) as part of a plan to violate or evade any Federal law or regulation or to avoid any transaction reporting requirement under Federal law or regulation;

    b. was designed, whether through structuring or other means, to evade any requirements of this chapter or of any other regulations promulgated under the Bank Secrecy Act;

    c. served no business or apparent lawful purpose, and the reporting money services business knew of no reasonable

    explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction; or

  d. involved use of the money services business to facilitate criminal activity.

5. Financial institutions, including banks and money transmitters, were also required to file "currency transaction reports" (CTRs) for certain financial transactions. A CTR is a report that is submitted on United States Department of Treasury FinCEN Form 104. A domestic financial institution is required by federal law to file a CTR with the Department of Treasury for each financial transaction that involves United States currency in excess of $10,000. Such financial transactions include deposits, withdrawals, or exchanges of currency, or other transactions involving the physical transfer of currency from one person to another.

## Manner and Means

6. During the course of the conspiracy, the defendants, NORMA ERIZA-GOMEZ (hereinafter "NORMA") and MARINA ERIZA-GOMEZ (hereinafter "MARINA") along with others known and unknown to the Grand Jury, engaged in a scheme to help narcotics distributors launder money to Mexico. The defendants used money transmitters, personal bank accounts, and couriers to send substantial sums of currency to Mexico so that illegal narcotics would be shipped back to the United States.

*Bulk Cash Deliveries*

7. NORMA and MARINA coordinated the shipments of narcotics proceeds to and from various locations in the United States for shipment to Mexico. On or about January 27, 2015, NORMA offered to employ "Cooperating Source One" as a money courier, and said she would pay the source $1,500 to $2,000 per $100,000 that the source agreed to transport. The source would pick up money in cities like Chicago and deliver the funds to individuals in Texas. NORMA also informed the source that when she drove currency from different cities she would bring her children along so as not to raise suspicion. When meeting again with the source on or about January 29, 2015, NORMA said that the police had at one point stopped her when she was transporting narcotics and deployed a K-9 unit to sniff her vehicle. However, because her children were with her, the police did not closely inspect the vehicle and never found the narcotics.

*Money Transmitters*

8. NORMA and MARINA also used a variety of money transmitters to launder funds. They broke transactions into smaller amounts, utilized money transmitter agents that did not appropriately monitor customers, and recruited third parties to send funds to Mexico. For example, on or about February 20, 2016, MARINA requested that "Cooperating Source Two" help her launder $3,000 to Texas. MARINA drove the source to a money transmitter in Lawrenceville, Georgia and instructed the source to send $1,000 to "J.A." in Texas. MARINA then drove the source to another Lawrenceville money

transmitter and instructed the source to send $2,000 to "M.M." in Texas. MARINA paid the source $80 for transmitting these funds.

***Personal Bank Accounts***

9. NORMA and MARINA also used a number of bank accounts to launder funds. The defendants, or others working on their behalf, deposited funds into an account, and then notified other individuals located elsewhere who withdrew the funds from that account. This enabled the defendants and their co-conspirators to obtain immediate access to money across state lines and was designed to circumvent financial institutions' CTR filing requirements.

10. During the course of the conspiracy, MARINA directed Cooperating Source Two to open a bank account that could receive cash deposits from other individuals. Cooperating Source Two thereafter provided MARINA with the routing and account number of a bank account controlled by law enforcement. On or about March 8, 2016, unknown individuals deposited a total of $9,000 into this account. MARINA took these funds from the source so that they could be sent to Mexico. When meeting with the source to obtain the funds, MARINA stated that NORMA had fled to Mexico because one of her associates had been caught. MARINA also stated that while in Mexico, NORMA was locating people who could accept wired funds from the United States. During their meeting, MARINA informed the source that individuals in Mexico were looking for a house where they could "cook" for five days. These individuals were willing to pay $2,000 for the use of a house. They needed a different house every

7

month because they did not like to "cook" in the same place. MARINA and the source then discussed how they needed to learn to cook as they could make much more money.

All in violation of Title 18, United States Code, Section 1956(h).

### Forfeiture

11. Upon conviction of the offense alleged in Count One of the Indictment, the Defendants, NORMA ERIZA-GOMEZ and MARINA ERIZA-GOMEZ, shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in the money laundering offenses and all property traceable to such property including, but not limited to, a sum of money in United States currency representing the total amount of money involved in each offense for which the defendant is convicted.

12. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    a. Cannot be located upon the exercise of due diligence;

    b. Has been transferred or sold to, or deposited with, a third party;

    c. Has been placed beyond the jurisdiction of the court;

    d. Has been substantially diminished in value; or

    e. Has been commingled with other property which cannot be divided without difficulty;

It is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), to

seek forfeiture of any other property of said defendants up to the value of the forfeitable property described above; all pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2)(B), and Title 28, United States Code, Section 2461(c).

A ___True___ BILL

___Co___
FOREPERSON

JOHN A. HORN
  *United States Attorney*

THOMAS J. KREPP
  *Assistant United States Attorney*
Georgia Bar No. 346781

ALISON B. PROUT
  *Assistant United States Attorney*
Georgia Bar No. 141666

600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303
404-581-6000; Fax: 404-581-6181

9